Rubin, J.
(dissenting). I disagree with the majority’s novel con *636 elusion that we may refuse in our “discretion” to hear a case over which we have jurisdiction.
Mootness is an “aspect[ ] of justiciability.” O’Brien’s Case, 424 Mass. 16, 18 (1996). If a case is moot, there is a “jurisdictional defect.” Ibid. Unlike Federal courts, however, our Supreme Judicial Court has concluded it has discretion to hear and decide moot cases when it serves the public interest. “In . . . circumstances where some of the usual aspects of justiciability are missing — particularly where the case was moot as to the parties before the court — we have proceeded to render an opinion, if a question of general importance was presented which required resolution and if the jurisdictional defect would not interfere with or confuse that resolution.” Ibid. In the case on which the majority would rely, Lockhart v. Attorney Gen., 390 Mass. 780, 782-783 (1984), the Supreme Judicial Court articulated this rule and, unremarkably, declined to hear and decide a moot case, id. at 784-785.
This case, however, is not moot, and there is no opinion holding that when a case is as a matter of law not moot, we have discretion not to hear it. Rather, individuals with a claim of aggrievement over which a court has jurisdiction are entitled to know and be granted their rights, whatever they might be. Courts have a “virtually unflagging obligation ... to exercise the jurisdiction given them.” Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).
This suit was brought as a putative class action. The allegedly wrongful conduct continues with respect to members of the putative class, even though it has ended with respect to the named plaintiffs. In these circumstances, “[i]f the underlying controversy continues, a court will not allow a defendant’s voluntary cessation of his allegedly wrongful conduct with respect to named plaintiffs to moot the case for the entire plaintiff class.” Wolf v. Commissioner of Pub. Welfare, 367 Mass. 293, 299 (1975). Rather, the case will be held not to be moot. Id. at 297. This determination is a question of law, not, as the majority now holds, one of determining whether it would be “improvident” to hear the case. Indeed, in Wolf itself, the trial court that had held the case moot was reversed for legal error, with no suggestion that it had discretion not to hear the case. See id. at 300. See also, e.g., State Tax Commn. v. Assessors of Haverhill, 331 Mass. 306, 308 *637 (1954) (mootness is a “matter of law”).[1]
Nor, I should point out, is there any prudential reason to wait for the regulations mandated by LaChance v. Commissioner of Correction, 463 Mass. 767, 777 (2012)—which remain unissued years after that decision — to decide this case. LaChance says that due process requires, among other things, a hearing within ninety days for inmates confined to administrative segregation on awaiting action' status. Ibid. The plaintiffs contend that they are entitled to the more stringent regulatory protections provided for those held in departmental segregation units (DSUs) — including a hearing within fifteen days. Whatever the precise terms of the new regulations, they will not eliminate this disparity, and there is no reason to make those held in these conditions wait for an adjudication of their rights.
The judgment below therefore must rise or fall on its merits, and it is to those I turn.
Those inmates before us on awaiting action status were not automatically placed because of that status in special management units (SMUs), units whose conditions, including solitary confinement in cells twenty-three hours per day, are “substantially similar” (LaChance, supra at 774) to the extremely harsh conditions in DSUs. Rather, they were placed in SMUs only upon a determination by a prison official that their “continued presence ... in the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly running of the institution.” 103 Code Mass. Regs. § 423.06 (2007) (explaining when administrative segregation is permitted). They were placed in SMUs only because they were deemed to warrant administrative segregation because of a threat to safety and security. Before this placement, however, they were not afforded the detailed procedures required by 103 Code Mass. Regs. §§ 421.00 for placement in a DSU. Those regulations require a hearing before an impartial board, 103 Code Mass. Regs. § 421.12, at which there must be “substantial evidence” that an inmate poses “a substantial threat” either “to the safety of others; or ... of damaging or destroying property; or ... to the operation of a state correctional facility.” 103 Code Mass. Regs. § 421.09 (1994).
*638 In Haverty v. Commissioner of Correction, 437 Mass. 737, 763, 764 n.36 (2002), the Supreme Judicial Court said that as a matter of interpretation of the regulations, the procedural safeguards detailed in 103 Code Mass. Regs. §§ 421.00 “must be afforded to all prisoners before they are housed in DSU-like conditions” except for those prisoners “whose stay ... is intended to be, and is, brief,” meaning “days, not weeks.” The court reminded the Department of Correction (DOC) that “in 1995 the commissioner attempted to repeal the DSU regulations, but his attempt to do so was enjoined by a single justice of this court. The commissioner did not appeal from the order of the single justice, nor does the record reflect that he has made any subsequent attempt to modify or repeal the regulations.” Id. at 758 (footnote omitted). Absent a court order to the contrary, these regulations thus “have the full force of law.” Ibid. This has not changed since then, and because Haverty remains good law, the prisoners in this case are entitled to the protections of those regulations as a matter of State law.
The DOC essentially argues that LaChance, 463 Mass. at 774-775, overruled Haverty, supra, and means that these prisoners are entitled only to what LaChance commanded, and no more. The language of the LaChance opinion, robust with favorable citation to Haverty and to Hoffer v. Commissioner of Correction, 412 Mass. 450 (1992), certainly does not appear to have been intended to weaken the procedural protections for prisoners like these. In fact, the LaChance court reiterated that its prior decisions stated that (1) “under DOC regulations, indefinite confinement in any unit where conditions are substantially similar to those of a DSU entitles an inmate to the protections afforded by the DSU regulations,” and (2) “the protections afforded by the DSU regulations are mandated by due process considerations.” LaChance, 463 Mass, at 774-775, citing Hoffer, supra at 455, and Haverty, supra at 762. As the majority observes, the court noted that these prior decisions were “not directly controlling” on the issue actually decided, LaChance, supra at 775. However, this disclaimer seems to strengthen the argument that LaChance did not overrule Haverty: the State law issue decided in Haverty was different from the issue the court was addressing in LaChance, that of Federal due process in the context of 42 U.S.C. § 1983.
On the other hand, as the majority indicates, it can be argued that, if the Supreme Judicial Court in LaChance was ordering the promulgation of regulations only for prisoners in DSU-like con *639 ditions, it must have meant to overrule Haverty. If all the prisoners who would be entitled to the benefit of the regulations ordered by LaChance — including primarily the requirement of a hearing within ninety days — were already entitled under Haverty to the benefit of 103 Code Mass. Regs. §§ 421.00, which mandates a hearing within fifteen days, requiring the drafting of the new regulations would have been purposeless. Rather than having done something purposeless, the argument goes, the Supreme Judicial Court must have overruled Haverty sub silentio.
The flaw in this argument lies in its major premise. The procedures required by the court in LaChance are not only for those in conditions “substantially similar” to those in the system’s designated DSUs. Rather, the court concluded as a matter of Federal due process that the procedures it described are required for “an inmate confined to administrative segregation on awaiting action status, whether such confinement occurs in an area designated as an SMU, a DSU, or otherwise.” LaChance, 463 Mass. at 776. “Administrative segregation is a ‘temporary form of segregation from general population used when the continued presence of the inmate in the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly running of the institution.’ ” Id. at 769 n.4, quoting from 103 Code Mass. Regs. § 423.06 (2007). Nothing requires that those on administrative segregation be held in harsh conditions “substantially similar” to those in a DSU.
The court in LaChance said nothing about the question presented here: whether the subgroup of those held in administrative segregation on awaiting action status whose conditions of confinement are as harsh as those in DSUs are entitled as a matter of State law to the more stringent protections of 103 Code Mass. Regs. §§ 421.00. Under Haverty, the answer to that question is yes. But that does not render the LaChance regulations purposeless. The LaChance regulations still will articulate the protections required for those inmates held in administrative segregation in conditions which are not substantially as restrictive as those in a DSU, who are not entitled to the more robust protections of Haverty.
For these reasons, I would reverse the judgment of the trial court.

The plaintiffs’ motion for class certification was denied solely as a logical consequence of the judge’s ruling granting the defendants’ motion to dismiss on the merits. The proper disposition of this case would include the judge on remand considering the plaintiffs’ motion anew.